Manuel VENTURA, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CF–475.

District of Columbia Court of Appeals.

Argued Feb. 22, 2007.

Decided June 21, 2007.

---

Leila Thamer, Public Defender Service, with whom James Klein, Jaclyn Frankfurt and Andrea Roth, Public Defender Service, were on the brief, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, Roy W. McLeese III, Thomas J. Tourish, Jr., and Kimya Jones, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

This is an appeal from a judgment of conviction the trial court entered after a jury found appellant guilty of assault with intent to commit robbery while armed in violation of D.C.Code §§ 22–401, –4502 (2001) and carrying a dangerous weapon, a knife, outside the home or place of business in violation of D.C.Code § 22–4504(a) (2001). Appellant seeks reversal of his convictions on the grounds (1) that the trial court erroneously denied his pretrial request for a DNA test of blood stains on the clothing that he was wearing at the time of the alleged robbery and that was later recovered from his apartment as he was being transported by ambulance for treatment of a stab wound; and (2) that the trial court erred by failing to intervene *sua sponte* when (a) the prosecutor at trial improperly elicited prior consistent statements of the complainant through the testimony of various witnesses, and (b) the prosecutor made inflammatory comments

and emphasized to the jury the fear the complainant had suffered as a consequence of appellant's alleged actions.

We are not persuaded upon the particular facts and circumstances of record that the trial court's actions constituted reversible error. We first set forth the general background of the case and then, for each claim of error, discuss the salient facts and our reasoning as to why we reach our conclusion that the judgment of conviction must be affirmed.

## I.

### Background

The record contains the testimony of four prosecution witnesses: (1) the complainant, Mauro Contreras;[1] (2) Muhammad Jallow, the security guard who was on duty at the time of the robbery in the apartment building where both the complainant and appellant resided; (3) Officer Joseph Belfiore, the first responding officer from the Metropolitan Police Department ("MPD"); and (4) Officer Eldred Boria, a Spanish-speaking MPD officer, who responded to the scene initially to investigate the robbery and then again, less than an hour later, to investigate a report from appellant's cousin that appellant had been stabbed.

The complainant, Mr. Contreras, testified that on July 17, 2003, shortly after 11:00 p.m., he began walking home from the Columbia Heights Metro Station to the apartment building in which he lived, in the 1400 block of Ogden Street, Northwest, after finishing his shift as a cook at a restaurant in Chinatown. After passing appellant and another man sitting together in a park, the complainant became aware that these men had begun to follow him.

The complainant observed that appellant, who is Hispanic, was wearing dark pants and a white t-shirt and carrying a jacket under his arm; appellant's companion, an African American, was wearing black pants and a blue jacket. As the complainant quickened his walk homeward, the men kept pace, and then the complainant began to run as appellant called out in Spanish for him to "stop." The complainant reached the door to his apartment building moments before appellant arrived, while appellant's companion stayed back a little distance as if to serve as a lookout.

The complainant unsuccessfully tried to unlock the building's door with several hasty swipes of his keycard at the door's external card reader. Before the complainant could unlock the door, appellant arrived and stepped between the complainant and the card reader, blocking the complainant's access to the card reader and thus to the building. Appellant ordered the complainant to "give me your money," and the complainant explained that he did not have any money. Appellant then demanded the bracelet and two gold chains that the complainant was wearing, for which the complainant had paid over $1,000, and the complainant noticed that appellant was brandishing a knife in his right hand. The complainant refused to give appellant anything, and appellant struck the complainant twice in the face with his left hand, causing an injury to the complainant's eye. Nevertheless, the complainant again refused to give appellant anything, and appellant tried to stab the complainant with the knife he was wielding. The complainant deflected the attempt, using two hands to push appellant's attacking arm across appellant's body and

1. The complainant, who is originally from Mexico, testified through a Spanish-speaking interpreter.

turning the hand that held the knife towards the left side of appellant's body.

The complainant testified that he did not try to stab appellant, did not notice whether appellant got cut during their struggle, and did not observe any blood on appellant.[2] Appellant, however, drew back from the complainant after their struggle, and in this moment of separation, the complainant again swiped his keycard at the card reader and this time gained access to the building. The complainant ran into the building yelling "Security" to summon the on-site security guard, who stepped out of a nearby laundry room. The complainant told the security guard what had happened, pointing out appellant as he fled away from the building. The complainant and security guard then went back into the building, encountered appellant's mother, and told her what had just happened. The police were called, and the complainant gave a statement to the responding officers. About an hour and fifteen minutes later, police officers returned to the complainant's apartment and asked him to look through the blinds on his third-floor apartment window to view a suspect in police custody outside. The complainant positively identified appellant as his assailant. Subsequently at trial, the complainant again identified appellant as his assailant.

The security guard, Muhammad Jallow, testified that he was on duty inside the apartment building about 11:20 p.m. on July 17, 2003, when he heard someone screaming, "Security, security, help me, help me." Mr. Jallow rushed toward the front door and saw the complainant entering the building and pointing at a man about six feet away from him. Mr. Jallow,

who had worked in the building since 1999, recognized both men as residents of the building. Mr. Jallow testified that he had been introduced to appellant approximately two months before the assault "as the son of Maria, the resident of [a first floor apartment]," and that he usually saw appellant "up to three or four times a day" as appellant entered or exited the apartment building. Mr. Jallow observed that appellant was wearing a camouflage, military-style jacket.

Mr. Jallow testified that he watched appellant "jog" away from the front of the building as the complainant explained that appellant had just attempted to rob him with a knife.[3] Mr. Jallow observed that the side of the complainant's face under the eye was "red and kind of swollen," but saw no other injuries to the complainant. Mr. Jallow called inside to Maria, appellant's mother, whom he had just seen in the laundry room. Appellant's mother came to the lobby and the men told her what had just transpired. Mr. Jallow then called the police. When MPD officers arrived, Mr. Jallow accompanied them to the apartment that he knew to be the residence of appellant and told appellant's cousin, Roxana Flores, that the police were there looking for "Maria's son." Appellant was not home, so the police officers obtained appellant's name and date of birth from Ms. Flores.

Mr. Jallow further testified that approximately an hour later, MPD officers asked him to accompany them back to the apartment of appellant's mother "[b]ecause the police wanted me to have a look at somebody." Mr. Jallow observed appellant ly-

---

2. The complainant also testified that he personally suffered no additional injuries during the struggle over the knife.

3. Mr. Jallow recalled that the complainant told him the knife fell from appellant's hand during the struggle. Officer Boria, whose testimony is discussed below, did not recall being told this detail. The police searched the area, but no knife was ever recovered at the scene.

ing on his stomach on a bed with paramedics attending to his lower back, but did not see a wound or any blood because the paramedics were holding gauze over the area. Mr. Jallow identified appellant as the man he had seen running away from the building earlier that evening. Mr. Jallow also made an in-court identification of appellant.

Officer Joseph Belfiore, who has only "[a] very minimal understanding" of Spanish, and his partner were the first officers on the scene in response to a radio dispatch for a robbery. Officer Belfiore testified that he recognized a potential language barrier and immediately called for a Spanish-speaking officer to respond; in the meantime, he determined the details of the robbery attempt and got a description of the suspect by communicating with the complainant through a combination of English, Spanish, and pantomime gestures.[4] Officer Belfiore observed that the complainant was "agitated" and "perspiring" and that he had "[b]right redness around the higher cheekbone area and around the eye and the beginning stages of bruising." Officer Belfiore did not see any additional injuries that the complainant may have sustained. Officer Belfiore looked for but did not find any blood at the scene of the incident.

Metropolitan Police Officer Eldred Boria, who is fluent in Spanish, arrived on the scene shortly after Officer Belfiore and obtained a more detailed statement from the complainant in Spanish. Officer Boria testified that the complainant's "face was red, and he said his shoulder was hurting." The security guard, Mr. Jallow, took Officer Boria to the apartment in which appellant lived with his mother, and the officer spoke with appellant's cousin, Ms. Flores. However, appellant was not home at the time.

Officer Boria further testified that approximately one hour later, he returned to the apartment building in which the complainant and appellant lived in response to a radio dispatch for a stabbing victim in the same apartment unit that he had visited earlier when he had been looking for appellant. Once inside the unit, Officer Boria observed appellant lying on a bed with a stab wound in his lower left back, and the officer saw that there was wet blood around the wound, on appellant's clothes, and on the sheets. Mr. Jallow had accompanied Officer Boria into this room and identified appellant as the man he previously had seen in front of the building after the complainant cried out for help.

Appellant told Officer Boria that approximately one hour earlier, a Hispanic male had tried to rob him in front of the apartment building and had stabbed him, but that he did not see the man's face. Appellant told the officer that he had been accompanied by an African American male at the time, but appellant did not know that man's name or address. As paramedics and officers were escorting appellant out of the building, Officer Boria asked the complainant to look out his window for a show-up identification, and the complainant made a positive identification of appellant as his assailant. At this time, appellant was placed under arrest.

Officer Boria testified that before appellant was transported by ambulance to the hospital, the officer returned to appellant's apartment unit and asked Ms. Flores to retrieve a change of clothes for appellant; the t-shirt appellant was wearing, for example, "was all torn up." As appellant's cousin looked around for a pair of pants, she picked up a pair with blood stains on

4. Officer Belfiore also received some translation assistance from Mr. Jallow; however, at trial, the officer's testimony was limited to only what appellant told him directly.

them and identified them as the pair appellant had taken off when he came home injured. She offered these pants to Officer Boria, along with a green, camouflage military-style jacket with a bloodstain on its back; Officer Boria did not request these articles of clothing, but he did accept them.[5] Police officers also searched the area in front of the building and other areas around the perimeter of the building, but did not locate the knife or any sign of blood.

In the defense case, only one witness was called to testify: appellant's cousin, Roxana Flores, who shared the Ogden Street apartment with appellant and his mother.[6] Ms. Flores testified that after appellant returned home on the evening of the incident, she observed that he was bleeding from a wound on his back and had "lots of blood" on his clothing. She recalled appellant telling her that he had been attacked from behind in a robbery attempt by an unknown assailant in a park near their apartment building. Ms. Flores testified that she called 911 and asked for the police and an ambulance because "somebody had been held up" and "he was badly wounded." At the conclusion of Ms. Flores' testimony, the trial court permitted appellant to enter the well of the court and lift his shirt to show the jury the scar from the injury.

## II.

### Appellant's Request for Pretrial DNA Testing

On appeal, appellant first contends that the trial court erred when it denied his pretrial request for a test of the DNA contained in the biological material on his bloody clothing. The issue first was raised *sua sponte* by the trial court pursuant to its obligation under the Innocence Protection Act ("IPA"), D.C.Code § 22–4131 *et seq.* (Supp. 2002), to provide certain notifications to a defendant under qualifying circumstances. Specifically, the IPA provides, in a section entitled "Pre-conviction DNA testing," that

(a)Prior to trial for or the entry of a plea to a crime of violence, the defendant shall be informed in open court of physical evidence seized or recovered in the investigation or prosecution of the case which may contain biological material and of the results of any DNA testing that has been performed on such evidence.

(b)A defendant charged with a crime of violence shall be informed in open court:

(1)That he or she may request or waive independent DNA testing prior to trial or the entry of a plea if:

(A) (i)DNA testing has resulted in the inclusion of the defendant as a source of the biological material; or (ii)Under circumstances that are probative of the perpetrator's identity, DNA testing has resulted in the inclusion of the victim as a source of the biological material; and

(B)There is sufficient biological material to conduct another DNA test;

(2)That he or she may request or waive DNA testing of biological material prior to trial or the entry of a plea if the biological material has not been subjected to DNA testing; and

(3)Of the potential evidentiary value of DNA evidence in the defendant's case and the consequences of requesting or waiving DNA testing.

---

5. These two articles of clothes were admitted into evidence at trial as Government's Exhibits 2 and 1, respectively.

6. Ms. Flores testified via a Spanish-speaking interpreter.

(c)A defendant who makes a knowing, intelligent, and voluntary waiver of DNA testing or independent DNA testing pursuant to subsection (b) of this section prior to trial or the entry of a plea is not eligible for post-conviction DNA testing under § 22–4133 unless the defendant is entitled to have the conviction to which the DNA evidence relates set aside under § 23–110 or Rule 32 of the Superior Court Rules of Criminal Procedure.

D.C.Code § 22–4132 (Supp.2002).

The trial court held a pretrial hearing and entertained oral argument on the matter—including an *ex parte* proffer by defense counsel of the defense theory of the relevance of the evidence. During this hearing, defense counsel argued that testing was available under D.C.Code § 22–4132(b)(1), relying on the statutory language that counsel claimed indicated "that my client may request independent DNA testing prior to trial or the entry of a plea if DNA testing has resulted in the inclusion of the defendant as the source of biological material."

At the conclusion of the hearing, the trial court denied the request for DNA testing because D.C.Code § 22–4132(b)(1) refers to "circumstances that are probative of the perpetrator's identity" and the judge concluded: "I don't think this goes to the perpetrator in this case." The court continued:

There's no question about identity here, the question is what happened.

And I understand how you may say well, although it doesn't go to identity, it goes to my theory of how this all occurred. You may be entitled to that for some other reason but not under this Act. This Act is narrow.... [I]t's Innocence Protection Act. It's focused on a particular thing, on wrong people being accused. It's focused on where someone else, how it all came about. It's not a broad thing of you have a right to DNA testing, another right to defendant.

If it doesn't go to identity, then you may ask for this but not under the statute.[7]

■ On the record before us, we conclude that the trial court did not err in denying defense counsel's request for DNA testing under D.C.Code § 22–4132(b)(1). DNA testing was not done in this case, and thus DNA testing did not "result[ ] in the inclusion of the defendant ... or ... the victim as a source of the biological material." Consequently, D.C.Code § 22–4132(b)(1) had no applicability to the particular facts of the present case.

However, in this appeal, appellant invokes a different subsection of the IPA, D.C.Code § 22–4132(b)(2), for his contention that he was entitled to DNA testing.[8]

7. In the briefs and at oral argument, the parties suggested that pretrial DNA testing of the blood stains may have been available pursuant to Super. Ct.Crim. R. 16, which provides:

Upon request of the defendant the prosecutor shall permit the defendant to inspect and copy or photograph ... tangible objects ... which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense, or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Super. Ct.Crim. R. 16(a)(1)(C) (2006). We need not address this possibility, however, because defense counsel did not argue to the trial court that DNA testing of the blood stains was available under Rule 16 and appellant has not challenged on appeal the trial court's failure to order the DNA testing under Rule 16 *sua sponte*.

8. The plain error standard generally applies to contentions not raised before the trial court, *see Brawner v. United States*, 745 A.2d 354, 357 (D.C.2000), and defense counsel did not invoke D.C.Code § 22–4132(b)(2) at trial.

Subsection (b)(2) provides that a defendant charged with a crime of violence shall be informed in open court

> That he or she may request or waive DNA testing of biological material prior to trial or the entry of a plea if the biological material has not been subjected to DNA testing....

D.C.Code § 22–4132(b)(2).

■ Appellant contends that, regardless of relevance, DNA testing was still warranted because a trial court has no discretion under D.C.Code § 22–4132(b)(2) to deny a "request" for pretrial DNA testing. We disagree, concluding, first, that D.C.Code § 22–4132(b)(2) does not confer an automatic "right" to pretrial DNA testing upon request, and second, that under the particular facts and circumstances of this case, the trial judge did not abuse his discretion in denying appellant's request for pretrial DNA testing.

### A.

■ We conclude that a trial court has discretion to deny a request for pretrial DNA testing under D.C.Code § 22–4132(b)(2). As this court has stated:

> The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. Therefore, in determining the meaning of a statute, we must examine first its language to determine if it is plain and admits of no more than one meaning. In examining the statute, we give the words used the

meaning ordinarily attributed to them. This court will look beyond the ordinary meaning of the words of a statute only where there are persuasive reasons for doing so. Such circumstances would include: (1) when the legislative history or alternative constructions reveal ambiguities; (2) the literal meaning would produce absurd results; and (3) when necessary to effectuate the statutory purpose as gleaned from the statute as a whole or its legislative history.

*Sullivan v. District of Columbia,* 829 A.2d 221, 224 (D.C.2003) (citations and internal quotations omitted). Our review of the trial court's interpretation of the statute is de novo. *Id.*

With these familiar principles in mind, we examine the relevant language of the IPA. D.C.Code § 22–4132(b)(2) provides:

> A defendant charged with a crime of violence shall be informed in open court: ... (2)That he or she may request or waive DNA testing of biological material prior to trial or the entry of a plea if the biological material has not been subjected to DNA testing....

■ For present purposes, the operative word in § 22–4132(b) is the verb "request," which in this context we understand to mean "to ask" for something, to do something, or for permission or opportunity to do something. *E.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1929 (Philip Babcock Gove ed., Merriam–Webster 2002) (1961). Trial courts frequently consider "requests" from defendants and must exercise discretion when responding

Appellant suggests that the plain error standard is inappropriate here because "[d]efense counsel made an apparently inadvertent reference to a different subsection of the IPA" and "counsel made clear that he was seeking initial testing of the blood." This assertion is belied by the record; in particular, we note the separate discussions of subsections (b)(1)(A)(i) and (b)(1)(A)(ii) and the concern

expressed over whether the evidence was "probative of the perpetrator's identity," language that appears only in subsection (b)(1). However, in light of our conclusion—based on the facts and circumstances of record—that the trial judge did not err by denying pretrial DNA testing, we need not consider whether any error was reversible error under the plain error standard.

thereto; any motion is, in effect, a formal request for action from the court, the response to which is subject to judicial discretion as appropriate within the parameters of the relevant rule or statute.[9] The Legislature's use of non-mandatory language in § 22–4132(b) is revealing, because "[e]ven when a statute uses mandatory language, such as the word 'shall,' the courts are to construe the statute in the light of reasonableness." *Brown v. District of Columbia*, 727 A.2d 865, 868 (D.C. 1999) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 69–70, 31 S.Ct. 502, 55 L.Ed. 619 (1911), and *United States v. Am. Tobacco Co.*, 221 U.S. 106, 179–80, 31 S.Ct. 632, 55 L.Ed. 663 (1911)).

We note that if no judicial discretion were contemplated in a trial court's response to a party's "request," many of the applicable procedural rules would contain superfluous language. *See, e.g.,* Super. Ct. Crim. R. 4(a) & (d)(3)-(4) (directing what action "shall" be taken with regard to warrants upon *request* of the prosecutor or defendant); Rule 9(a) & (c)(2) (same); Rule 6(e)(3)(C)(ii) & (iv) (discussing the circumstances under which the trial court "may" disclose matters otherwise prohibited upon request of the defendant or of an attorney for the government); Rule 11(e)(1)(B) (noting that a defendant's "request" for a particular sentence or sentencing range is not binding on the trial court, even if recommended or unopposed by the prosecutor); Rule 15(b) (providing that a defendant not in custody "shall have the right to be present" at a deposition "upon request subject to such terms as may be fixed by the Court"); Rule 16 (providing what "must" or "shall" be furnished, disclosed or permitted during discovery upon request); Rule 30 (providing that a party "shall" be given the opportunity to object to instructions out of the presence of the jury upon request); Rule 31(d) (providing that the trial court "shall" individually poll the jurors upon a party's request); Rule 45(b) (providing that the court in its discretion "may" order the enlargement of a specified time period upon timely request).

■ We note further that within D.C.Code § 22–4133 (Supp.2002), the section on *post-conviction* DNA testing enacted alongside § 22–4132, the D.C. Council included standards to constrain the court's traditional discretion in responding to a request.[10] In light of the absence of such a limiting mechanism in § 22–4132(b)(2), and the unambiguous language of "request" rather than "right," we find nothing within § 22–4132(b)(2) that constrains a trial court's traditional discretion when responding to a request for *pretrial* DNA testing.[11]

---

**9.** *See, e.g., Ferguson v. United States*, 866 A.2d 54, 59 (D.C.2005) (reviewing the denial of a request for sanctions under Rule 16 for abuse of discretion); *Burns v. United States*, 880 A.2d 258, 261 (D.C.2005) (reviewing trial court's decision to deny a Rule 118 motion without a hearing for abuse of discretion); *Tyer v. United States*, 912 A.2d 1150, 1166 (D.C.2006) (reviewing trial court's decision to deny request for missing evidence instruction for abuse of discretion).

**10.** D.C.Code § 22–4133(d) provides:

The court *shall* order DNA testing pursuant to an application made under subsection (a) of this section upon a determination that the application meets the criteria set forth in subsections (a) and (b) of this section and there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent of the crime for which the applicant was convicted or adjudicated as delinquent.

(Emphasis added.)

**11.** The IPA section on pretrial DNA testing was introduced through an amendment after the D.C. Council's first reading of the proposed legislation, which was primarily inspired by "the absence of a judicial remedy for persons who obtain new evidence that

■ Finally, we note that the court's traditional discretion includes the power and responsibility to weigh the *relevance,* or probative value, of all evidence against the danger of unfair prejudice. *See, e.g., Hartridge v. United States,* 896 A.2d 198, 216 (D.C.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1503, 167 L.Ed.2d 242 (2007). "Relevant evidence is simply that which tends to make the existence or nonexistence of a contested fact more or less probable than it would be without the evidence." *Id.* (citations, internal quotes, and alterations omitted). Without losing sight of the IPA's goal, broadly read, of encouraging the use of DNA testing in *appropriate* cases, *see Bouknight, supra* note 11, 867 A.2d at 251–52, we conclude that a trial court has discretion to deny a request for pretrial DNA testing under D.C.Code § 22–4132(b) when the results of such testing would not be admissible at trial, as when, for example, the results of that testing could have no potential relevance to the issues before the court.

### B.

■ Turning now to the particular facts and circumstances of the present case, and viewing the facts and arguments as they were available to the trial judge at the time of his ruling, we cannot conclude that the judge abused his discretion by denying appellant's request for DNA testing because no potential relevance was established for the results of that testing. As the government indicated at the pretrial hearing, the prosecution case relied upon appellant's clothing *only* for identification purposes because it demonstrated to the jury that such clothing matched the physical description of the clothing worn by the complainant's assailant. The presence of biological material, *viz.,* the blood, simply was not relevant.[12]

We note that the trial judge required defense counsel to articulate a defense theory for the *relevance* of the result of DNA testing, eventually resorting to an *ex parte* bench conference to preserve the integrity of defense counsel's trial strategy. Defense counsel advanced two theories for the relevance of the results of DNA testing: (1) if the test results showed *only* the presence of the appellant's DNA, then those results could serve as evidence that appellant did not have a subsequent bloody encounter with a third person following the attempted robbery of the complainant; and (2) if the test results showed *also* the presence of the complainant's DNA, then those results could serve to impeach the complainant's account that he was not cut during the encounter. We are not persuaded that either theory demonstrates sufficient relevance so as to support a conclusion that the trial judge abused his discretion in denying appellant's request for testing of the blood on his clothes.[13]

---

affirmatively shows their innocence more than three years *after conviction or plea of guilty." See Bouknight v. United States,* 867 A.2d 245, 251 (D.C.2005) (emphasis added).

**12.** The parties agree, as do we, that the blood on appellant's clothing is properly considered "biological material" under the IPA. *See* D.C.Code § 22–4131(2) (" 'Biological material' means ... blood ... which apparently derived from the perpetrator of a crime or, under circumstances that may be probative of the perpetrator's identity, apparently derived from the victim of a crime.").

**13.** Although scientific advances continue to improve DNA testing procedures, we note that a decision to allow pretrial DNA testing may add significant costs and delays to a criminal trial. *See, e.g., United States v. Van Chase,* 137 F.3d 579, 583 (8th Cir.1998) (excusing trial delay resulting from DNA testing backlog at FBI laboratory). These administrative realities should not limit the availability of DNA testing in appropriate cases; however, they do reinforce our conclusion that the trial court retains its traditional discretion as the gatekeeper for admissible evidence.

■ We conclude that the absence of a *third person's* DNA on the clothes fails to support appellant's contention that he was not involved in a violent encounter with a third person, and, more importantly, evidence showing that appellant had a subsequent encounter with *another* person is not relevant to appellant's guilt or innocence with regard to the offense with which he was charged. Furthermore, because under this theory of relevance, appellant is searching only for the presence *vel non* of the blood of a *third person* to disprove the occurrence of a *separate* encounter, rather than the presence of the blood of the perpetrator or victim of the present offense, we conclude that this theory does not even provide appellant an avenue under the IPA to *request* DNA testing of the blood, much less provide a *right* to such testing. *See* D.C.Code § 22–4131(2) (limiting the definition of "biological material" to that "which apparently derived from the perpetrator of a crime or, under circumstances that may be probative of the perpetrator's identity, apparently derived from the victim of a crime"). Thus, the trial court did not abuse its discretion by denying appellant's request for the DNA testing of the blood pursuant to appellant's first theory of relevance.

As to appellant's second theory of relevance, *viz.*, the possibility that the bloodstains on appellant's clothing consisted, at least in part, of the complainant's blood, we note that defense counsel could proffer no evidence that the complainant ever bled during the encounter. Thus, the security guard and the police officers who all saw the complainant's condition immediately after the attempted robbery testified that the only injuries they observed were contusions on the complainant's face. (Indeed, it was to appellant's benefit that there were no bleeding knife wounds that only would have served to bolster the complainant's story that he was the one assaulted.) We note further that at the pretrial phase of the case, when the trial judge ruled upon appellant's request for DNA testing, the possible impeachment value of the DNA test results was wholly speculative.

In sum, we are satisfied that the results of DNA testing properly could have been excluded at trial because they were not relevant. Thus, under the circumstances, we conclude that the trial court did not abuse its discretion in denying the pretrial request for DNA testing.

### III.

### *Admission of Prior Consistent Statements*

■ Appellant next contends that the trial court erred by failing to intervene *sua sponte* when the prosecutor elicited prior consistent statements of the complainant through the testimony of the complainant, the security guard, and the investigating police officers. Defense counsel did not object to the admission of these statements, and thus we review the present challenge for plain error. *See Irick v. United States,* 565 A.2d 26, 32 (D.C.1989).[14]

■ "In general, prior statements consistent with a witness' trial testimony are inadmissible on the theory that mere repetition does not imply veracity, and that once an inconsistency in statement is shown, evidence of additional consistent

---

14. Plain error must be "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial," and reversal of a conviction "is appropriate only in a particularly egregious case, when a miscarriage of justice would otherwise result." *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (citations and internal quotations omitted).

statements does not remove the inconsistencies." *Daye v. United States*, 733 A.2d 321, 325 (D.C.1999) (quoting *Warren v. United States*, 436 A.2d 821, 826 (D.C. 1981)) (internal quotation omitted). Thus, "[t]he exclusion of prior consistent statements is intended to avoid the prejudice of unfairly bolstering the witness' credibility." *Porter v. United States*, 826 A.2d 398, 410 (D.C.2003) (citing *Daye*, 733 A.2d at 327). Exceptions exist, and prior consistent statements may be admissible, for example, where statements are used in rebuttal to overcome a charge of recent fabrication, if the statements were made before the motive to fabricate arose, *see Daye*, 733 A.2d at 325, or where the statements are ones of prior identification, *see Porter*, 826 A.2d at 410.

Where prior consistent statements have been improperly admitted, we have repeatedly recognized that "the harm that may occur even if the jury should credit [the] prior consistent statements is less serious than the inadmissible introduction of clearly prejudicial evidence." *Daye, supra*, 733 A.2d at 327 (citations, internal quotation, and alteration omitted); *see also Porter, supra*, 826 A.2d at 410. "[S]ince the reason for their general inadmissibility is that 'mere repetition does not imply veracity,' it is not unreasonable to assume in practice that juries can be made to see this point and—aided by counsel's argu-

ment—tend to discount the weight of statements wrongly introduced." *See Daye*, 733 A.2d at 327 (footnote omitted). "And only in a case where the government's proof of guilt was 'marginal' have we thought the prejudice from this impermissible bolstering enough to warrant reversal without more." *Id.*; *accord Porter*, 826 A.2d at 410. We are unable to conclude that, upon the record before the court, this case presents a case of "marginal" proof of guilt.

■ Preliminarily, we assume here that the prior consistent statements were improperly admitted because they were admitted on direct examination rather than rebuttal and no foundation was laid to show that they had been made before the motive to fabricate arose[15] or that they otherwise were admissible under a separate hearsay exception. However, under the circumstances, appellant has failed to satisfy the plain error standard.

First, we agree with the government's argument that defense counsel at least partially invited the error when counsel indicated that the defense would *not* object to testimony containing prior out-of-court statements of the complainant so long as those statements were made directly to the testifying police witness rather than through an interpreter.[16] *See McClain v.*

---

15. Indeed, the prosecution would have had difficulty laying such a foundation, because under the defense theory of the case, the complainant's motive to fabricate arose at the time the incident occurred. *See Daye, supra*, 733 A.2d at 325 ("[T]o be admissible under this exception a statement consistent with the witness' trial testimony must have been made at a time when the witness did not have a motive to fabricate.") (quoting *Reed v. United States*, 452 A.2d 1173, 1180 (D.C.1982)).

16. At the beginning of Officer Belfiore's testimony, defense counsel requested a bench conference to express a concern as to whether

Officer Belfiore, who did not speak Spanish, "was able to get the information from Mr. Contreras directly, or if it was provided from someone translating on his behalf, and if that's the case, then it's hearsay." After the prosecutor explained that the information was conveyed directly from the complainant to Officer Belfiore and offered to lay a foundation, defense counsel continued:

I obviously have no objection to the information that is provided directly—well, I'm not going to be objecting to the information provided to him by the complaining witness provided that it's information that went directly from the complaining witness to the

*United States*, 871 A.2d 1185, 1192 (D.C. 2005) ("Courts are especially reluctant to reverse for plain error when it is 'invited.' ") (citations omitted). Second, we perceive no prejudice from the prosecutor's eliciting of prior consistent statements because defense counsel also elicited prior consistent statements from the same witnesses.[17] Next, we view the defense counsel's lack of objection and his own eliciting of prior consistent statements as a strategic decision, especially in light of defense closing arguments that emphasized that the statements in fact were not consistent and thus were not credible;[18] consequently, any *sua sponte* intervention by the trial judge might have impeded the effectiveness of counsel and intruded on the attorney/client relationship.

Finally, the evidence of appellant's guilt was not "marginal." *See Daye, supra,* 733 A.2d at 327. Apart from the prior consistent statements repeated by the witnesses, the prosecution's case rested on the eyewitness testimony of the complainant, the identification testimony from the security guard who came on the scene in response to cries for "help," and reasonable inferences that could be drawn from the facts and the timing of events, as against appellant's unsubstantiated and self-serving report, via his cousin's testimony, that *he* was the one assaulted and robbed; it is axiomatic that determinations of credibility and the weighing of evidence are within the province of the fact-finder. *E.g., Jackson v. United States*, 819 A.2d 963, 967 (D.C.2003). Accordingly, we are satisfied that under the circumstances, the trial court's failure to intervene *sua sponte* did not result in a miscarriage of justice. *See McGrier, supra* note 14, 597 A.2d at 41.

## IV.

### *Improper Prosecutorial Argument*

 Finally, appellant contends that the trial court erred in failing to intervene

---

police officer. If there's some intermediary, then I have an objection on that portion. If there's a foundation laid that he did—that the information that he is conveying here on the stand was provided without the need of any interpreter, then I have no objection to that portion, but I would request that a foundation be laid.

Officer Belfiore then proceeded to testify only about what he had been told by the complainant *directly*.

17. In his brief, appellant noted his intention to file during the pendency of this appeal a motion to vacate his conviction based on defense counsel's "failure to object to the admission of the prior consistent statements" and repetition, on cross-examination of Officer Boria, Officer Belfiore, and the complainant, of "some of the prosecutor's questions that had elicited details of the complainant's story."

18. In his closing argument, defense counsel stated:

Now, the Government takes the position that there were three consistent stories.

Let's talk about what are the consistent stories. Well, let's talk about what exactly are the consistent stories. You have through pantomime a description of how things happened, and some English and Spanish with the first officer, and then you have—and there was Officer Belfiore. And then you have Officer Boria, who was, in fact, the one who spoke Spanish and seemed to be the one who got most of the story. And then you have Mr. Muhammad Jallow, who was also part of this.

We are talking not about consistent stories, we are talking about different stories, different versions, I've already pointed out.

Defense counsel then proceeded to identify possible inconsistencies between the various versions of events: the way the complainant deflected the knife and whether the knife was dropped; what appellant had been wearing; how many times the complainant was struck in the face; the order of the events including the requests for money and jewelry, the punches to the complainant's face, and the brandishing of the knife; and whether appellant was blocking the complainant's access to the card reader, the door, or both.

*sua sponte* when the prosecutor in closing argument and elsewhere (1) made allegedly inflammatory comments about the complainant not wanting to be a victim and (2) emphasized to the jury the fear the complainant had suffered as a consequence of appellant's actions. When reviewing a claim of improper comments by the prosecutor, this court has stated:

> First, we must determine whether any or all of the of the challenged comments by the prosecutor were improper. If we conclude that they were, we must then, viewing the remarks in context, consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case.

*McGrier, supra* note 14, 597 A.2d at 41 (citations, internal quotations, and alterations omitted). Although preserved error is reviewed for "substantial prejudice," when the defendant has failed to object to the prosecutor's supposedly improper remarks, as in this case, the defendant must demonstrate plain error. *Id.*

■ We perceive no error with regard to the first set of challenged comments, in which appellant contends that the prosecutor improperly appealed to the prejudices of the jury by discussing how the complainant did not want to be a victim and how the complainant had worked for the money to purchase his expensive jewelry. Rather than inviting the jury to make a

statement with its verdict about the evil of the charged crime, as appellant contends, the government appears to have been merely responding to the defense theme during the trial, later reiterated in the defense closing argument, that the complainant's story was not credible because he risked injury to protect his property.[19]

■ The second set of challenged comments, *viz.*, those discussing the fear the complainant experienced at the time of the assault, constitutes a more serious contention. "This court has repeatedly held that it is improper for the prosecutor to employ inflammatory tactics and devices intended to appeal to the passions and fears of the jurors or to seek a verdict reflecting sympathy for the victim." *Powell v. United States,* 485 A.2d 596, 599 (D.C.1984) (citing *Hawthorne v. United States,* 476 A.2d 164, 170–72 (D.C.1984)), *cert. denied,* 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985).

Appellant, however, still has failed to satisfy the plain error standard. First, rather than being unduly prejudicial, the complainant's fear at the time of the crime had particular relevance in this case: both to explain why the complainant ran home and then struggled with his assailant and also to prove an element of robbery for the offense of assault with intent to rob while armed. *See Dublin v. United States,* 388 A.2d 461, 464 n. 4 (D.C.1978). Second, rather than objecting, defense counsel instead made a strategic decision to respond to the prosecutor's comments about fear in

---

19. In closing, defense counsel argued:

> Now let's talk about Mr. Contreras' story, because I was pretty impressed by it. I was pretty impressed by it because I am amazed that a person has the wherewithal to stand up to someone over some jewelry. Now, don't get me wrong, I think that was clear. This jewelry was very important to him. He was more than happy to show it and tell you the price he paid for it. And it's very nice jewelry, don't get me wrong, but to

> risk your life over it—not so much—I can understand, no. But then—you know, and the person not being armed. But then pulling out a knife and then saying no; but then taking the additional step of this person is three steps away from me, and you know what? I'm going to turn my back on him so that I can get my passkey open, which I will—which I have to take time to do. Ladies and Gentlemen, this is not believable.

the defense closing argument.[20] Third, the trial court instructed the jury that "[t]he statements and arguments of the lawyers are not evidence," and a jury is presumed to follow instructions. *See Plater v. United States,* 745 A.2d 953, 959 (D.C.2000); *see also Mills v. United States,* 599 A.2d 775, 786 (D.C.1991) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.") (quoting *Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). Finally, as discussed above, the evidence of appellant's guilt was substantial. *See Clarke v. United States,* 256 A.2d 782, 787 (D.C.1969) ("Where ... the evidence of guilt is otherwise strong, courts are reluctant to reverse a conviction because of indiscriminate remarks during closing argument."). Even if the prosecutor's comments might have marginally exceeded the bounds of permissibility, we are satisfied that the judge's failure to interrupt closing arguments to intervene *sua sponte* did not substantially sway the judgment, much less result in a miscarriage of justice. *See McGrier, supra* note 14, 597 A.2d at 41.

*Affirmed.*

**20.** The defense closing argument began:

Fear. That was the first word out of the Government's mouth. Fear. That's what we are talking about, fear. Ladies and gentlemen, this isn't about fear.

Now, actually it was occurring to me that I heard the word fear before; twice actually. The first time was in the Government's opening statement. They want to talk about the fear Mr. Contreras had. I also recall the judge saying the word fear. He said it when he said you should determine the facts without prejudice, fear, sympathy or favoritism.

Ladies and gentlemen, you should determine the facts. That's what we're here for, not fear. We are here for facts. So let's talk about the facts.