*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0117

CARDELL R. TORNEY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2012-CF1-009423)

(Hon. Danya A. Dayson, Trial Judge)

(Argued November 23, 2021                    Decided August 31, 2023)

*Claire Pavlovic*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Bryan H. Han*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney, and *Elizabeth Trosman*, *Peter V. Taylor*, and *Kathleen Kern*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and FISHER, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY.

Concurring opinion by *Senior Judge* FISHER at page 44.

EASTERLY, *Associate Judge*: We consider in this case whether forensic nurse examiners with the District's Sexual Assault Nurse Examiner (SANE) program are part of the prosecution team for Rule 16 purposes when they conduct a consensual forensic examination of a sexual assault complainant and, consistent with the trial court's assumption in this case, answer that question in the affirmative. We also consider whether there is an upper limit on the admission of prior consistent statements under the report of rape rule recognized by this court in *Battle v. United States*, 630 A.2d 211 (D.C. 1993); we conclude that the admission of an official report of rape made to the SANE program or similar authority, close in time to the alleged assault, generally obviates admission of further prior consistent statements under *Battle* absent additional justification. We discern no basis to reverse Mr. Torney's convictions for first degree sexual abuse while armed and kidnapping while armed based on these holdings, however. Instead, in light of the evidence presented in this case, we are persuaded by the government's argument that the trial court's refusals to grant the defense's requested sanction for the loss of photographs of the complainant taken by the Sexual Assault Nurse Examiner and to limit the admission of prior consistent statements under *Battle* were harmless. Thus we affirm.

## I.     Facts

On a cold and wet Saturday evening in December 2010, the complaining witness, L.L., went out drinking with a friend, Jess, and a few people near U Street and 12th Street NW.  The group visited two bars, drinking at each, and parted ways sometime early Sunday morning.  Eight years later, at trial, L.L. could not remember the exact time they all left the second bar, but thought their departure coincided with closing time, and Jess testified that she "believe[d] it was between 1:30 and 2:30 maybe."  Per L.L.'s testimony, when she reached the front door of her house, a man approached her from behind and put a knife against her back, demanding money.  After L.L. offered him credit cards instead, the man pulled her over to her next-door neighbor's yard, pushed her face down onto the muddy grass, and anally penetrated her with his penis against her will.  She could not recall how long the incident lasted, but she testified that, after raping her, her assailant jumped up and ran away.  L.L. went into her house and called 911 at 3:37 A.M., telling the operator that she had been "raped" by an "African American" man "wearing all black."  She then contacted her husband, parents, and several close friends and told them she had been raped.

A dispatched detective transported L.L. to Washington Hospital Center,

where, with her consent, she was examined by a nurse examiner with the SANE program. The nurse examiner testified that these consensual examinations typically take two to four hours and include obtaining a "verbatim" narrative of the incident, conducting a head-to-toe physical examination, taking photographs, and collecting "forensic" evidence from the complainant's body using a "sexual assault kit" which contains sterile "envelopes[,] swabs[,] slides[,] and little boxes to put the evidence in." In L.L.'s case, the nurse documented L.L.'s account of the incident in her report (the "SANE report"):

> Got home and was opening my front door with a key. . . . He kept threatening me with a knife . . . he pushed me face down and put weight on my back so I could not move. I [sic] pulled my pants down and penetrated rectally. Not sure if he used protected [sic] and/or ejaculated. I was screaming in pain at this point. He told me to stop screaming. And I tried to stop screaming, but I was in pain, so I continued to scream. . . .

The nurse then conducted a physical examination of L.L., noting in her report dirt on L.L.'s "outer" clothing—"Patient is dressed with a blue sweater with dirt on the front, silver top with dirt on the front. Dirt noted on the right front thigh area of black pants. Also dirt noted on the right side of silver top"—and an anal laceration. The nurse examiner took photographs. And, using a sexual assault evidence kit, the nurse examiner swabbed both the exterior of her genital and anal area and the interior of her rectum, and took a blood sample. DNA from the swabs taken during the forensic examination later yielded a "hit" on Mr. Torney's genetic profile in a

database, resulting in his arrest at the end of May 2012.

Mr. Torney was charged with one count of first-degree sexual abuse while armed[1] and one count of kidnapping while armed.[2]  Over the course of the three-week trial in August 2018, the fact that Mr. Torney had had anal sex with L.L. was undisputed, thus the government's focus was on proving that the sex was nonconsensual.  The government called L.L. to testify about the incident.  The government put into evidence L.L.'s 911 call reporting the incident and portions of the SANE report (minus any useful photographs, see *infra* Part II)—the former admitted as an excited utterance, and the latter admitted in part as a past recollection recorded (the nurse's notes regarding her "general physical examination," "specimen collection" and "discharge information") and in part as a statement made for medical treatment (L.L.'s redacted narrative, see *supra*).  The government called L.L.'s ex-husband and friends to testify about learning of the assault from L.L. contemporaneously with her report to police, which the court deemed admissible under *Battle*, and about the changes they perceived in her demeanor thereafter.  L.L.'s ex-husband also testified that he and L.L. had never had anal sex and that she

---

[1] D.C. Code §§ 22-3002(a)(1), - 3020(a)(5), -3020(a)(6), -4502.

[2] D.C. Code §§ 22-2001, -4502.  Mr. Torney was also charged with one count of robbery while armed, D.C. Code §§ 22-2801, -4502, but the government dismissed this charge before the jury was instructed.

had indicated that she was not interested in doing so. The government called nationally renowned DNA analyst, Bruce Budowle, to explain that data from L.L.'s anorectal swab, which appeared to show an allele inconsistent with L.L. and Mr. Torney's DNA profiles, should not be interpreted to show another contributor, as an analyst employed by the Metropolitan Police Department ("MPD")[3] had opined. Dr. Budowle testified because this apparent allele was below the standard threshold, "the best explanation" was that it was not true DNA but rather "a stutter peak," which commonly occurs in the copying process used for DNA analysis. Lastly, the government introduced Mr. Torney's statement to the police denying that he had ever had sex with a white woman as evidence of his "guilty conscience" about raping L.L.

In his defense, Mr. Torney, through counsel, argued that all that had happened after his consensual sexual encounter with L.L. was a "desperate and destructive lie" borne of "guilt . . . fear . . . and panic" that her ex-husband (whom she had accused of abuse in their divorce five years after the incident) would discover her infidelity. Attacking the government's investigation, Mr. Torney called an expert to critique the SANE report and several other witnesses to establish that the government could

---

[3] The District's Department of Forensic Sciences had not yet been established.

have collected security footage from the U Street area and to call into question why the government had not been able to bring in any residents from L.L.'s neighborhood who had heard her scream. Mr. Torney also stressed on cross examination and in closing the scant corroborating evidence of a nonconsensual encounter, including absence of any documentation in the SANE report that L.L. was bruised or abraded from being forced to the ground and the lack of preserved clothing or photographs from the forensic examination. And he emphasized that DNA analysts from both the MPD and a private company had concluded that the biological evidence from swabs of L.L.'s anus showed a mixture of male profiles, which he argued indicated that she had previously engaged in anal sex despite her testimony that she had not. Finally, Mr. Torney highlighted the gaps and inconsistencies in L.L.'s testimony regarding the timeline of the night, the appearance of her assailant, and the assailant's alleged actions to argue that she fabricated her account of assault.

After three days of deliberation, the jury returned a note stating that it had been unable to reach a unanimous verdict "thus far." The trial judge instructed the jury to continue deliberations but did not deliver any sort of anti-deadlock charge. After another day of deliberation, the jury found Mr. Torney guilty of first degree sexual abuse while armed, and kidnapping while armed, D.C. Code §§ 22-3002(a)(1), -2001.

## II.    Rule 16

Rule 16 provides that, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph . . . documents, data, photographs, tangible objects, . . . or portions of any of these items, if the item is within the government's possession, custody, or control" and is material to the defense's preparation or the government plans to use the item in its case-in-chief. Super. Ct. Crim. R. 16(a)(1)(E)(i)-(ii).  Pursuant to the rule, Mr. Torney requested discovery from the government of, among other things, photographs and any physical materials recovered from the complainant at the hospital.  The only photographs the government disclosed from L.L.'s SANE exam were one image of a barcoded patient label and two overexposed images without any content.  During the government's direct examination of the forensic nurse examiner at trial, however, Mr. Torney learned that additional photographs were taken of L.L. during the exam but were never produced in response to his Rule 16 requests.  Specifically, the government elicited testimony from the forensic nurse that, pursuant to her normal practice, she would have taken other photographs of L.L. with her clothes on as well as multiple images of any injuries but that these photographs had been lost.  L.L. corroborated this testimony, testifying that the nurse examiner "definitely" photographed her "vagina and anus area."

In response to testimony, Mr. Torney requested the trial court find a Rule 16 violation and sanction the government by preventing it from arguing that the photographs ever existed and striking the nurse's testimony, or in the alternative by giving a missing evidence instruction. The government argued that it had not violated Rule 16 because the SANE program is a separate entity from the government, meaning the photographs were never in its possession, custody, or control. The government also detailed its efforts to obtain photographs from L.L.'s exam. After noting its copy of the SANE report did not contain any photographs, the government had requested the photographs from the SANE program in 2012 and 2015; in response to both requests SANE staff had represented that no photographs existed. When prosecutors asked a third time in 2016, SANE staff turned over three photographs—the three the government had given to Mr. Torney—but none depicted anything useful. After learning from its witness in the lead-up to trial in the summer of 2018 that other photographs in fact had been taken, the government made a final request, but this request did not yield any other photographs. Based on these efforts and the asserted limited probative value of the photographs, the government argued there was no basis for a missing evidence instruction.

In its order denying the defense's motion for sanctions, the court "assum[ed] without finding that the SANE nurse is part of the prosecution team." The court also

appeared to assume that the photographs would have been subject to disclosure under Rule 16. Nonetheless, the court declined to sanction the government for the loss of the photographs. Without explicitly addressing the government's culpability in the loss or failure to disclose the loss of the photographs, the court determined that any Rule 16 violation did not merit a missing evidence instruction because (1) the photographs of L.L.'s injuries would have revealed little regarding whether the sexual act was consensual; the only noted injury was an anal laceration which the defense expert testified could occur with consensual sex, and (2) the loss of any photograph showing L.L.'s clothing, while "marginally more relevant," also required no sanction because the written notes in the SANE report detailed the dirt on the clothing. The trial court implicitly declined to grant Mr. Torney's alternative (and actually initial) sanction request that the testimony be struck and the government be precluded from arguing that the photographs would corroborate L.L.'s testimony, appearing to rely on the government's representation that it would not make an argument to that effect. The defense subsequently argued that the government's failure to preserve L.L.'s clothing from the night in question was an additional Rule 16 violation which at a minimum justified allowing the defense to argue a lack of corroboration of the witnesses' testimony and "a faulty investigation." The court ruled that the defense could "argue both."

Before this court, Mr. Torney argues that the forensic nurse examiner is a part of the "prosecution team" for Rule 16 purposes, the government was grossly negligent in failing to preserve the photographs of L.L. and L.L.'s clothing, and the trial court abused its discretion in refusing to sanction the government. While we "review the judge's discovery rulings for abuse of discretion," the issue of "proper construction of Criminal Rule 16 is a legal question as to which our review is de novo." *Weems v. United States*, 191 A.3d 296, 300 (D.C. 2018) (italics omitted).

### A.    The Sexual Assault Nurse Examiner (SANE) Program

As a foundation to our Rule 16 analysis, we examine the nature of the SANE program and its functions. The SANE program is designed to "provide[] comprehensive medical forensic care to sexual assault victims." D.C. Code § 23-1907(1). The program is staffed by "forensic nurse examiner[s]," who have "specialized training in medical forensic evidence collection." *Id.* § 23-1907(2). The forensic nurse examiners, also colloquially (and redundantly) referred to as "SANE nurses," provide "medical forensic care" by conducting comprehensive examinations of sexual assault complainants, documenting and photographing their injuries, collecting "a sexual assault kit or other physical evidence[] when

indicated,"[4] and/or providing them with medications for STDs. *Our Programs*, District of Columbia Forensic Nurse Examiners, https://www.dcfne.org/our-programs; https://perma.cc/CYN4-2M8Z (last visited May 15, 2023). "Following the exam, [the SANE] nurses preserve the chain of custody" for any evidence collected and transfer it to law enforcement when appropriate. *Id*. Given these tasks, SANE nurses receive specialized training "to perform forensic examinations for collecting evidence in sexual assault cases, to serve as expert witnesses in court cases, and to understand the emotional and psychological impact upon sexual assault victims." MPD Special Order SO-01-06, "Sexual Assault Nurse Examiners Program (SANE)" at 1 (Apr. 2, 2001); *Who We Are*, District of Columbia Forensic Nurse Examiners, https://www.dcfne.org/about-us; https://perma.cc/J37J-RKU2 (last visited May 10, 2023). According to the nurse examiner who testified in Mr. Torney's case, a forensic nurse examiner must be an experienced, trained nurse, but working a shift for the SANE program, is "different" from and cannot be done in conjunction with working a nursing shift in the emergency room.

---

[4] As noted above, the nurse examiner in this case explained that the sexual assault kit contains sterile "envelopes[,] swabs[,] slides[,] and little boxes to put evidence in."

The SANE program has a symbiotic relationship with MPD: when an MPD officer deems a sexual assault complainant is in need of a forensic examination, the officer "encourage[s] the victim to use the . . . SANE Program [services]." MPD SO-01-06, at 3. If the complainant chooses to use SANE services, officers discourage any activities that might alter the evidence (for example, showering, using the bathroom, or changing clothes), promptly transport the complainant to Medstar Washington Hospital Center, and contact the designated SANE nurse, who "will be at [the hospital] to meet with the [complainant] within an hour of being contacted." MPD General Order GO-OPS-304.06, "Adult Sexual Assault Investigations," at 9, 15 (Dec. 22, 2006). Once at the hospital, the transporting officer briefs the nurse with any relevant information regarding the assault. MPD SO-01-06, at 5. After the complainant signs a consent form stating that the "items may be used in criminal . . . proceedings," with the complainant's permission the SANE nurse conducts the exam described above. *Our Programs*, District of Columbia Forensic Nurse Examiners, *supra*. MPD is then responsible for retaining the collected evidence for the length of the case's statute of limitations for the purposes of prosecution. MPD GO-OPS-304.06, at 3.

The relationship between MPD and the SANE program has existed since 2000, MPD SO-01-06, at 1, and was statutorily formalized in the Sexual Assault

Victims' Rights Amendment Act in 2014, *see* Sexual Assault Victims' Rights Act of 2014, D.C. Act 20-348, 61 D.C. Reg. 5913 (June 14, 2014) (amended by the "Sexual Assault Victims' Rights Amendment Act of 2019," D.C. Council, Report on Bill 23-0067 at 5, 14 (July 11, 2019) [hereinafter B23-0067 Report]). The Act also formalized other related programs that had long been in practice, such as the SANE program's operational entity, the District of Columbia Forensic Nurse Examiners (DC FNE) at the MedStar Washington Hospital Center, B23-0067 Report at 14, 40, as well as the District of Columbia's Sexual Assault Response Team, a group of public and private agencies and organizations—including MPD, the USAO, and DC FNE—to coordinate responses to sexual assault cases, D.C. Code § 4-561.12.[5]

### B.     SANE Nurses as Part of the Prosecution Team

Against this backdrop, we consider the threshold question of whether forensic nurse examiners in the SANE program are part of the prosecution team such that

---

[5] *See also* Office of Victim Services, *FY09 Performance Accountability Report*, at 2 (2009), https://dmv.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/OVS_FY09PAR.pdf; https://perma.cc/YZ8W-B3EM (explaining initiative 1.3, which created protocols for the Sexual Assault Response Team as well as "chain of custody protocol between the hospital emergency rooms, the SANE nurses and the MPD Mobile Crime Lab").

they are subject to Rule 16. *See Weems*, 191 A.3d at 300 (stating that Rule 16 applies not only to the prosecutor's office, but also to the entire "prosecution team"). In determining who is a member of the prosecution team, this court has "looked to: (1) whether the actor performed a governmental function; [or] (2) whether the actor, though performing in a [non-governmental] function, was sufficiently involved in the prosecution or investigation of a criminal offense so that, for discovery purposes, the function may be deemed 'governmental.'" *Rahman v. United States*, 208 A.3d 734, 739-40 (D.C. 2019) (internal quotation marks omitted); *see also Myers v. United States*, 15 A.3d 688, 691 (D.C. 2011) (explaining the two inquiries). In other words, the "prosecution team" may extend beyond the MPD,[6] which quintessentially performs the government function of capturing and recovering items that are later put in evidence at trials, to encompass other entities that assist with "criminal investigations" and provide "key information" as part of such investigations. *See, e.g.*, *Copeland v. United States*, 271 A.3d 213, 217 n.2, 221-22 (D.C. 2022) (extending Rule 16 obligations to employees of the Protective Services Division (PSD) of the D.C. Department of General Services, which provides building security

---

[6] *Crocker v. United States*, 253 A.3d 146, 155 (D.C. 2021) (concluding the police violated their Rule 16 obligations to preserve evidence they collected because "the police . . . reasonably should have expected from the outset that appellants' counsel would want to inspect" items seized from the alleged crime scene); *Robinson v. United States*, 825 A.2d 318, 328 (D.C. 2003) (recognizing the police "form[] an integral part of the prosecution team").

at government facilities, because it "closely coordinat[ed] with MPD" in that case and the "MPD is an integral part of the prosecution team").

We conclude that, when enlisted by law enforcement to aid in a criminal investigation with the consent of a sexual assault complainant, SANE nurses are a part of the "prosecution team" for the purposes of Rule 16. Their regular and expected function is to examine complainants, collect physical evidence for the purposes of criminal investigation, and "preserve the chain of custody" for transfer to law enforcement. *Our Programs*, District of Columbia Forensic Nurse Examiners, *supra*. To this end, SANE nurses have a systematic collaborative relationship with the police—core members of the prosecution team, see *Copeland,* 271 A.3d at 222—that is extensively delineated in MPD's protocols. See *supra* Section II.A. From the time that the police inform the SANE nurse on duty that a sexual assault complainant is being transported to the hospital for examination, the SANE nurses maintain direct communication with the police and rely on the police to assist them in their forensic collection goals. For example, the dispatched detective in this case, pursuant to protocol, prevented L.L. from using the bathroom "[b]ecause [MPD] needed to get her to the hospital immediately to have the sex kit done." Furthermore, "the role of the [SANE nurses] typically does not terminate upon completion of the" evidence collection and medical treatment or transmission

of evidence and information to the police, but instead "continues until the [nurse] has testified as an important prosecution witness at trial." *Cf. United States v. Oates*, 560 F.2d 45, 68 (2d Cir. 1977) (explaining that U.S. Customs Service chemists who analyzed substances were "important participants in the prosecutorial effort" and subject to Fed. R. Evid. 803(8)).

The evidence establishes that the SANE nurse who examined L.L. performed this "prosecution team" function. She testified that her job on a SANE shift was "different" from that of a regular ER nurse, in part because her objective in conducting a SANE exam is "to collect forensic evidence." In this case, she fulfilled that objective and placed the biological materials obtained from L.L.'s examination "into a double-locked locker that [the SANE nurses] have specifically for this evidence." The nurse also testified that she had a "checklist of questions" for sexual assault victims, including asking for a narrative of the incident which she usually documented "verbatim." And the nurse testified that per protocol it was her job to use "digital photography for documenting genital and non-genital trauma," and to "proper[ly] stor[e] . . . [these] digital forensic photographs" for later use in a criminal investigation and any prosecution.

Even accepting for the sake of argument the government's position that the SANE nurses' primary purpose is to provide medical care, their other "function[s] . . . [are] sufficiently involved in the prosecution or investigation of a criminal offense so that, for discovery purposes, the function[s] may be deemed 'governmental'" in cases where a complainant consents to the investigation. *Rahman*, 208 A.3d at 740.[7]  Accordingly, the evidence they collect is within the "possession, custody, or control" of the government and therefore is subject to Rule 16.

**C.    The Loss of the Photographs but not the Clothes as a Rule 16 Violation**

The applicability of Rule 16 to the SANE program in these circumstances thus established, we consider whether the conduct in question in this case violated the rule's preservation and disclosure obligations.  Under Rule 16, the government is

---

[7] Highlighting that the prosecution must provide proof to SANE staff of the complainant's consent or obtain a subpoena, the government argues the prosecution's limited control over the evidence collected by SANE nurses demonstrates that the nurses are not a part of the "prosecution team." But a showing of prosecutorial control is not required to establish that an individual or agency is part of the "prosecution team" for Rule 16 purposes. *See, e.g.*, *Copeland*, 271 A.3d at 222 (concluding PSD was subject to Rule 16 where its interactions were with MPD alone and not prosecutors).  In any event, because we address here the circumstance where a complainant consents to the criminal investigation, the prosecution's access to the information that the SANE nurse collected is unimpeded.

charged not only with disclosing material evidence in its possession, custody, or control to the defense, but also with preserving that evidence in the first place so that it can be disclosed. *Askew v. United States*, 229 A.3d 1230, 1241 (D.C. 2020). Mr. Torney argues that the government violated the rule by failing to preserve both the photographs the nurse took of L.L. during her SANE exam and the outer clothing that L.L. was wearing at the time.

Based on the record, we agree with Mr. Torney that the photographs from L.L.'s SANE exam were at some point in the possession of the SANE program and therefore in the possession of the prosecution team. Although the examining nurse initially testified only that she was "pretty sure" she took the pictures, upon further questioning by the prosecutor she confirmed that she was "sure there were other pictures [besides the three disclosed] that somehow did not get saved."[8] L.L. corroborated this in her testimony, as she recalled someone taking multiple pictures of her during her exam.

We further conclude that the photographs were material and thus subject to

---

[8] The trial court hedged in its findings, emphasizing that "the photographs *may* have existed." To the extent that the court in effect found that the photographs might not have existed, such a finding was not supported by the evidence, and the government does not defend that finding on appeal.

disclosure by the government under Rule 16.  (We note that the government did not argue that even if the SANE program were part of the prosecution team the photographs would not be subject to disclosure).  Although the actual probative value of the pictures is unknown due to their loss, *see infra*, we have repeatedly explained that Rule 16 evidence need not be favorable to the defense; it may in fact be favorable to the government.  *See Askew* 229 A.3d at 1241 n.19 (Under Rule 16, "a defendant need not make the *Brady* showing that the information is favorable to [the] accused.") (internal quotations and citations omitted); *see also Weems* 191 A.3d at 306 (evidence did not have to be "exculpatory or helpful to appellant to be 'material' to the preparation of his defense" under Rule 16).  It is enough that the evidence bear some "[more-than] abstract logical relationship to the issues in the case." *Howard v. United States*, 241 A.3d 554, 560 (D.C. 2020) (internal quotation marks omitted).  And if there is "a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence," the materiality standard is satisfied.  *Askew*, 229 A.3d at 1241 n.19.  Where consent and the quality of the government's investigation were central issues in this case, photographs documenting L.L.'s appearance hours after the incident easily satisfy this materiality standard.

Although we conclude that the loss of the photographs from L.L.'s examination violated Rule 16, we cannot conclude the same regarding the clothing that she wore to that exam. The nurse examiner testified in no uncertain terms that she never collected L.L.'s clothing beyond her underwear. The failure to collect and preserve L.L.'s clothing clearly reflected a deficient investigation and, as the nurse herself conceded, was directly contrary to SANE protocols. But Rule 16 imposes no duty to acquire evidence. *Weems*, 191 A.3d at 301. Due to inexplicable investigative shortcomings, L.L.'s outer clothing was never in the government's possession, custody, or control, and therefore their loss did not violate Rule 16. *See id.* at 300-02 ("It is not enough . . . that the [person] in possession of the item[s] would be willing to . . . provide the item[s] on request . . . .").

## D.    Sanctions

The determination that the government violated Rule 16 by failing to preserve and produce the photographs to the defense does not end the inquiry. We must next consider whether this failure warrants any sanction. When the government fails to preserve discoverable evidence, the trial court may impose sanctions under Rule 16 "in order to ensure not only that any advantage to the government from that loss [is] effectively mitigated but also to provide adequate deterrence against similar

derelictions in the future." *Smith v. United States*, 169 A.3d 887, 896-97 (D.C. 2017). While the "choice of which sanction, or whether to impose any sanction at all[,] is within the trial court's discretion," the trial court's decision "must be just under the circumstances." *Washington v. United States*, 111 A.3d 16, 21 (D.C. 2015) (internal quotation marks and brackets omitted). The court "must weigh (1) the degree of government negligence or bad faith involved; (2) the importance of the evidence lost; and (3) the evidence of guilt adduced at trial, in order to come to a determination that will serve the ends of justice."[9] *Smith*, 169 A.3d at 892 (cleaned up) (quoting *Koonce v. District of Columbia*, 111 A.3d 1009, 1014 (D.C. 2015)). Examining these factors, we conclude that the government's culpability, which we discuss separately, weighed in favor of some form of sanction. But the importance of the photographs and considerations of proportionality inherent in the "interest of justice" inquiry did not justify granting Mr. Torney's request for a missing evidence instruction. And we cannot say that the trial court should have directed the government not to use the testimony about the photographs to its advantage in closing where the government promised not to do so. The trial court should have at

---

[9] While it makes sense for a trial court to consider whether a sanction "will serve the ends of justice," any consideration of the whole of the evidence adduced at trial seems more appropriately reserved to this court in an assessment of harmlessness, especially since the trial court may be asked to impose a sanction well before the presentation of evidence is complete.

least struck the nurse's testimony referring to the photographs, but we conclude the trial court's failure to take this step was harmless against the backdrop of the evidence of this case.

### 1. The Government's Culpability

The trial court made no explicit findings regarding the government's culpability for the loss of evidence. Mr. Torney argues that the government was grossly negligent, meriting the imposition of a sanction. He relies on *Smith v. United States*, wherein we held that the failure of "two[] responsible government departments to assure the required preservation" of discoverable evidence was "no less than gross negligence" and on that basis affirmed the trial court's sanction of the government. 169 A.3d at 894, 897. Mr. Torney contends that, just as in *Smith*, two government departments were responsible for preserving the evidence in question here: the SANE program and MPD. But nothing in the record suggests that MPD ever had possession, custody, or control of the lost photographs; the nurse examiner testified that the exam photographs would have been downloaded to a local computer at the hospital and then uploaded to a SANE server and that the photographs were lost somewhere during or after that process. In short, because we discern no negligence by a second prosecution team entity in failing to preserve this

evidence, this case is unlike *Smith*.

Other grounds for concern, however, weigh in favor of a sanction. First, in addition to the SANE program's failure to preserve the photographs, we are troubled by the evident breakdown of communication between the SANE program and the prosecution regarding the existence of the photographs. When the prosecution asked in 2012 and 2015 for the photographs from L.L.'s exam, the SANE program staff denied that *any* photographs existed even though (1) by protocol, SANE examinations should generate multiple photographs of the complainant and (2) the report in this case indicated that photographs had indeed been taken. Granted various government lawyers kept asking the SANE program about the photographs, and it may be that, if the photographs had been lost early on, more persistent inquiries by the government in the years this case was pending would not have produced any additional photographs. Nevertheless the status of the photographs remained a mystery to the government until the months before trial. Clearly communication between the SANE program and the government until that time was inadequate. Needless to say, for the concept of the "prosecution team" to work for Rule 16 (or *Brady* and *Jencks*) purposes, the "team" must function as such.

Second and relatedly, the reason for the photographs' disappearance is

unexplained. The SANE nurse could offer little insight as to how or why the photographs were lost. And in its opposition to Mr. Torney's motion for sanctions in the trial court, the government gave no indication that it had undertaken any investigation to determine how the photographs vanished and thus provided no reassurance that there was no more widespread issue—technical or otherwise—with saving and storing these photographs. The government noted only that "DCFNE lost them." The government's lack of an explanation for the loss of the photographs raises questions about the thoroughness of both the USAO and the SANE program's efforts to trace the photographs' disappearance or prevent similar disappearances in the future. *See Askew*, 229 A.3d at 1242 (directing that the government's preservation of potentially discoverable evidence "must be undertaken on a systemic basis, taking into account . . . the steps needed to preserve it" and establishing "procedures and practices" to do so (internal quotation marks and brackets omitted)).

Most troubling, however, is the government's conduct once it finally became clear that the photographs were lost. At that point the government had an obligation to timely disclose that loss to the defense, before trial commenced. Our cases have strongly suggested that timeliness of disclosure is a component of the government's Rule 16 obligations. *See Ferguson v. United States*, 866 A.2d 54, 64 (D.C. 2005) (concluding the trial court erred in finding no Rule 16 violation in part because the

government "failed to comply with [Rule 16] in a timely manner" regarding the expected testimony of one of its witnesses and was instead "silent about its Rule 16 obligations" during the first four days of trial); *cf. Jones v. United States*, 263 A.3d 445, 461 (D.C. 2021) (stating that part of a trial court's role in overseeing Rule 16 compliance is to resolve "whether the requisite disclosures have been timely made"). This makes sense given that a prime purpose of Rule 16 is to give the defense access to information that will assist in the preparation for trial. *See* Super. Ct. Crim. R. 16(a)(1)(E)(i). By all indications in the record the government knew about the loss of the photographs at the latest months before trial but did not disclose this loss to Mr. Torney and instead allowed him to learn of it for the first time while the nurse was on the stand. Even allowing that the government reasonably relied on SANE staff's representations in 2012 and 2015 that no photographs existed from the examination, and credited that the photographs found in 2016 were all that were taken, the government became aware that other photographs had been lost well before the August 2018 trial: the trial prosecutors met with the SANE nurse about her testimony no later than June 2018 and learned of the "problem" that the photographs were missing. Although the prosecutors took the opportunity to "correct" the nurse's report in other ways, sharing a new version with the defense in July 2018, they did not give any indication to Mr. Torney that they now knew that the nurse examiner had taken other photographs but those photographs had been lost.

Instead, during trial, the government stood by while the defense expert (who was called in the midst of the government's case, before the SANE nurse) testified that the three content-less photographs "represent[ed] the total of the photographs that were taken in this case." And on cross-examination, the government questioned the expert on her lack of knowledge "as to whether the SANE nurse took other pictures or not" to undermine the expert's conclusions, even though its own failure to disclose the relevant information was the reason for the expert's gaps in knowledge. It was not until the government elicited testimony from the SANE nurse on direct about the other photographs she had taken and the defense objected that the government finally disclosed that photographs had been lost. The government offers no reason or explanation for why it did not disclose the loss of evidence to Mr. Torney at any point before that mid-trial revelation. The trial court did not appear to factor in the unexplained and untimely disclosure in assessing the necessity of a sanction, but we conclude here that this context weighs strongly in favor of the imposition of a sanction.

## 2. Mr. Torney's Requested Sanctions

Against the backdrop of this assessment of the government's culpability, we consider whether the trial court should have imposed one of the sanctions Mr.

Torney requested. Mr. Torney asked the trial court to sanction the government either by delivering a missing evidence instruction to the jury—i.e., instructing the jury that they could infer that the lost evidence would have been unfavorable to the government—or by excluding all testimony referring to the missing photographs and correspondingly precluding any government argument about them.

Trial courts retain "considerable latitude" in determining whether a missing evidence instruction should be given because such an instruction "carries with it several inherent dangers" of overcorrecting for the absence of evidence. *Washington*, 111 A.3d at 22-23. Here we cannot say that the trial court unreasonably exercised its discretion by declining to give a missing evidence instruction. The record provides "absolutely no indication as to . . . whether [the photographs] would be inculpatory or exculpatory." *Id*. The trial court's assessment that the loss of evidence of such ambiguous value did not justify instructing the jury that it could make an inference unfavorable to the government was within its "considerable discretion." *See Tyer v. United States*, 912 A.2d 1150, 1164 (D.C. 2006).

In his brief to this court, Mr. Torney argues, however, that the lost photographs "were 'highly material' because L.L.'s physical condition (her injuries and the condition of her clothing) were highly probative of whether there had been

a violent attack." He specifically notes the importance of determining via the missing photographs whether the anal laceration was recent, whether L.L. looked like she had recently been in a violent struggle, and whether her clothes were truly filthy and damaged as one would expect them to be if her story were true. We are unpersuaded. Even if the laceration was old, Mr. Torney's own expert testified there are many causes of anal lacerations, including constipation and hygienic issues, but this area of the body generally heals quickly; in other words, the probative value of an older laceration would have been minimal and the likelihood that the observed laceration was the product of sex with Mr. Torney was high. L.L. never testified that the assault involved a violent struggle; rather she testified that she was held up at knife point, pushed into muddy ground, and raped. And she likewise never testified that her clothes were ripped or damaged. But her clothes did have dirt on them, as detailed in the SANE report. This presumably would have been the case whether she had consensual sex or was raped outside on a cold wet night. (And if the idea is that the photographs of her clothes would have shown that the clothes were muddied later as part of an elaborate tale of deception, it is not clear that the photographs would have unloosed the threads of that tale).

As an alternative to a missing evidence instruction Mr. Torney requested that the court strike the nurse's testimony regarding the existence of the photographs and

order the prosecution to refrain from referring to the photographs in argument. Starting with the latter proposal, we conclude the trial court acted within its discretion to not sanction the government by restricting its argument. As alluded to above, when Mr. Torney reiterated his request for the court to bar "argument to the effect of if the photographs did exist, they would corroborate the complainant," the court stated that it "d[id]n't expect to hear that from the government." The government then stated, "No, we wouldn't expect to argue that, because we don't know." The court accepted this representation and moved on. It was well within the court's discretion to rely on a representation by an officer of the court about their future conduct. *See Beatty v. United States*, 956 A.2d 52, 57 n.5 (D.C. 2008) ("The prosecuting attorney is an officer of the court and . . . the court is entitled to accept" their representations. (internal quotation marks omitted)); *cf. Miranda v. Contreras*, 754 A.2d 277, 281 (D.C. 2000) (stating that "counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation").[10]

---

[10] Mr. Torney asserts that the government did, contrary to its representation, argue that the photographs would have corroborated its theory of the assault. We disagree. The government, in closing, acknowledged that the nurse examiner had done a poor job of collecting and preserving the evidence in this case. The government addressed the "defense expert's criticism of [the nurse examiner]," and conceded that "there were questions about some sloppiness here." It was in that vein that the prosecutor told the jury "it would have been nice" if the nurse examiner "had collected [L.L.'s] clothes . . . and if the pictures she said she took . . . had been preserved." The government's words are more reasonably read as an attempt to recognize and thereby minimize a weakness in the presentation of its case—not as a

This leaves Mr. Torney's related request that the court strike the nurse examiner's testimony regarding the existence of the photographs.[11] The trial court did not explicitly address this requested sanction, but it implicitly denied it. Considering the government's culpability in failing to preserve the photographs or to timely disclose their loss, *see* II.D.1. *supra*, the trial court should have, at a minimum, struck the nurse's testimony about the photographs. Indeed "[o]ur cases recognize that an instruction not to consider stricken testimony is usually a sufficient [and appropriate] remedy where a jury has heard damaging testimony it should not have been permitted to hear." *Foote v. United States*, 108 A.3d 1227, 1235, 1238 (D.C. 2015) ("the trial judge appropriately exercised his discretion in opting to strike, and to instruct the jury to disregard," opinion testimony the government had failed to disclose as required by Rule 16). But it is difficult to discern the adverse impact of the court's failure to do so in the context of Mr. Torney's consent defense.

_____

statement the photographs would have been helpful to the government. And we note that the defense did not object to this particular statement (although it objected to other portions of the government's closing) which presumably it would have done had it understood the government to be effectively going back on its promise to the trial court not to capitalize on the loss of the photographs.

[11] In addition to testifying about the existence of the photographs, the nurse examiner subsequently testified that she wished she had collected L.L.'s clothes because she did not have the photographs "to prove it"—but she never specified the antecedent to "it" and her answer merely highlighted that she had not followed SANE protocol and had lost *both* sources of evidence. Although the defense did object to this statement, like the government's reference to the photographs in argument, the nurse examiner's testimony did not clearly benefit the government.

The SANE report (which referenced photographs) was in evidence and contained information about the nurse examiner's observations of L.L. The government did not argue that the photographs would have corroborated the report, see *supra* note 10. And whether the nurse failed to save L.L.'s photographs or whether the SANE program lost any photographs she had taken, the loss supported Mr. Torney's defense that the government's investigation had been sloppy. In the absence of a showing of harm, we cannot say that the trial court abused its discretion in failing to strike the nurse examiner's testimony about the existence of the photographs that had been lost. *Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979) (in determining whether there is an abuse of discretion, we must determine "whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal").

### III. Whether the Trial Court Erred in Admitting Report-of-Rape Statements

Mr. Torney challenges the admission of any statements under the report-of-rape rule, also referred to as *Battle*[12] statements; alternatively, he argues that the trial court allowed too many *Battle* statements under the impermissible rationale of

---

[12] *Battle v. United States*, 630 A.2d 211 (D.C. 1993).

providing context for L.L.'s demeanor at the time she reportedly made the statements. We review the admissibility of evidence for abuse of discretion, but the underlying question of "[w]hether or not a particular hearsay exception applies to certain statements is a question of law which we review *de novo*." *In re L.C.*, 41 A.3d 1261, 1263 (D.C. 2012) (quoting *Dyson v. United States*, 848 A.2d 603, 611 (D.C. 2004)).

It is a well-established principle that prior consistent statements are generally inadmissible because "mere repetition does not imply veracity." *Daye v. United States*, 733 A.2d 321, 325 (D.C. 1999) (internal quotation marks omitted). The general bar on prior consistent statements is a preventative measure against "the danger that the parade of credible witnesses might draw attention away from the fact that their incriminating testimony is derivative and dependent on another's credibility." Roger Park & Tom Liniger, *New Wigmore: Impeachment and Rehab.* § 9.4 (1st ed. 2022) (internal quotation marks omitted). As this court has explained, "once an inconsistency in statements is shown, evidence of additional consistent statements does not remove the inconsistencies," *Scott v. United States*, 412 A.2d 364, 373 (D.C. 1980); instead, the admission of prior consistent statements simply has the effect of "unfairly bolstering the witness' credibility," *Porter v. United States*, 826 A.2d 398, 410 (D.C. 2003).

In *Battle*, however, this court recognized a limited exception to the bar on prior consistent statements: out-of-court reports of rape may be admitted in order to accommodate the vestiges of long-standing societal misconceptions of how victims of rape must behave. 630 A.2d 211, 216-17 (D.C. 1993). We reasoned that, by being permitted to put forth reports of rape, the sexual assault complainant would be able to (1) "negate the assumption that if there is no such evidence, no complaint was made"; (2) "show that the [complainant] behaved as is expected traditionally, i.e. by making a prompt report"; and (3) "rebut the claim of recent fabrication." *Dyson v. United States*, 848 A.2d 603, 611 (D.C. 2004) (internal quotation marks omitted). Nonetheless, *Battle* is not an open invitation to allow any and all forms of report. We recognized that "only enough details to show that the complainant reported the sexual assault charged" can come in, since "the testimony is offered to bolster the credibility of the complaint" against these prejudices, not for its substance. *Battle*, 630 A.2d at 222-24 (internal quotation marks omitted).

In this case, the trial court ruled pre-trial that portions of the SANE report, which included excerpts of L.L.'s narrative of the incident, and the recording of L.L.'s call to 911 were admissible as statements made for medical treatment and an excited utterance, respectively, avoiding reliance on the report-of-rape rule. But the court did rely on the rule to permit three witnesses—an MPD detective, L.L.'s friend,

and L.L.'s ex-husband—to testify to L.L.'s statements about the alleged assault. These witnesses' testimony yielded four sets of hearsay statements admitted under the rule: (1) L.L.'s statement made to her husband when she called him after calling 911,[13] (2) L.L.'s text message to her friend sent that night,[14] (3) a statement from L.L.'s subsequent phone call with the same friend,[15] and (4) L.L.'s statements to the detective dispatched to the scene.[16] Lastly, during the trial, one additional hearsay statement—from L.L.'s voicemail to her friend who had gone out with her on the night of the alleged assault[17]—was admitted apparently as a report of rape. Thus, in addition to the two reports of rape that were admitted on other grounds, a total of five hearsay statements from four witnesses were introduced to the jury under the *Battle* exception.

---

[13] "I was raped."

[14] "I've been attacked. I've been assaulted."

[15] "I was raped."

[16] "It happened in the neighbor's yard by the bush"; "[s]he said that he put his penis in her butt"; "[the knife] looked like a kitchen knife."

[17] "[L.L.] said that she had been attacked and raped. She was trying to enter her home, and she was on her way to the hospital, and to please not tell anyone."

### 1.    The Application of *Battle* to this Case

Mr. Torney argues that the *Battle* exception to the bar on prior consistent statements could not be invoked because he did not challenge L.L.'s story of rape on the grounds of her failure to timely report.  But Mr. Torney's defense theory is irrelevant to the application of *Battle*.  "[T]he report-of-rape rule is . . . rooted in . . . societal prejudices" that exist outside of the particulars of any one case.  *In re L.C.*, 41 A.3d at 1264 (explaining that the *Battle* exception also applies in bench trials because judges too are "part of society" and may indulge in prejudices).  In other words, the *Battle* exception rests on the presumption that the factfinder carries certain societal prejudices into the courtroom, regardless of whether a party relies on those prejudices directly.  Under this logic, we conclude that the government could seek to admit L.L.'s prior consistent reports of rape under *Battle* in this case.

### 2.    The Quantum of Evidence Admissible Under Battle

The question remains before us as to what kind of "report" and how many such "reports" the government is allowed to introduce.  This court has not yet squarely addressed these questions.  *See Velasquez v. United States*, 801 A.2d 72, 82 (D.C. 2002) (sidestepping the scope of *Battle* analysis because the error, if any,

was harmless); *Mattete v. United States*, 902 A.2d 113, 117 (D.C. 2006) (same). But *Battle* clearly confined its scope to admitting only enough facts to substantiate that a report was made, solely for the purpose of combatting societal misconceptions. 630 A.2d at 221-23; *id*. at 224 (holding the jury should be instructed on this "limited purpose" and be told that the "evidence should be considered as relevant to the fact that a complaint was made, and not for the truth of the statements contained in the complaint"). The logical corollary of *Battle* is that when the evidence of report goes beyond combatting the societal misconceptions and encroaches on biasing the jury for its cumulative effect, the evidence must be curtailed. *See In re L.C.*, 41 A.3d at 1265 n.* ("[B]ecause reports of rape may be admitted only for the fact that the report was made, there may be a limit to the number of reports that may be admitted before the evidence might be excluded as cumulative."). This aligns with our general approach to hearsay evidence, which (in the absence of formal rules of evidence) this court has restricted in order to ensure that the focus of a trial remains on sworn, in-court testimony. *See Tome v. United States*, 513 U.S. 150, 165 (1995) (recognizing that "[i]f . . . prior statements [were admitted] as substantive evidence to rebut every implicit charge that a witness' in-court testimony results from recent fabrication or improper influence or motive, the whole emphasis of the trial could shift to the out-of-court statements, not the in-court ones").

Thus, where a complainant's official report of rape via a forensic nurse examination close in time to the alleged assault has already come into evidence, the *Battle* function will in most cases have been met and no further reports of rape will be needed. A contemporaneous official report—for example, to the police or a SANE nurse —provides the trier of fact with a well-documented record that carries an aura of credibility, such that the report will generally suffice to combat the misconceptions motivating the report-of-rape exception. Admitting additional statements beyond such a report, however, will typically offer diminishing probative returns while risking additional improper suggestion of the statements' substantive truth. For these reasons the Connecticut Supreme Court, whose authority we cited in *Battle*, has held in subsequent cases that no other prior consistent reports of rape need be admitted when there is a timely official report. *State v. Samuels*, 871 A.2d 1005, 1013 (Conn. 2005) ("Once a sexual assault victim has reported the crime to the police . . . [report of rape] testimony by constancy witnesses that is based on post[-]complaint conversations with the victim . . . no longer serves the purpose of countering a negative inference as to the victim's credibility because it is the inconsistency between the victim's silence following the assault and her subsequent complaint to the police that gives rise to such an inference."). We similarly conclude that, as general matter, where the government moved a contemporaneous official report of rape into evidence, the concerns of *Battle* will have been sufficiently

addressed.[18]

To be clear, this general rule does not prevent the government from identifying some circumstance particular to the case that necessitates the admission of another prior report of rape under *Battle* in addition to a prior official report (admitted under *Battle* or some other hearsay rule or exception). Nor does it prevent the government from eliciting non-hearsay testimony about a complainant's actions and demeanor surrounding additional reports (for example, the fact that she called her husband that night and sounded distraught). *See Garibay v. United States*, 72 A.3d 133, 137 (D.C. 2013) (explaining that a "complainant's demeanor when discussing the subject is independent evidence that she was the victim of a sexual assault."); *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992) (testimony about

---

[18] This approach aligns with our past applications of *Battle*. *See, e.g.*, *Dyson*, 848 A.2d at 611-12 (concluding the trial court did not abuse its discretion in admitting a single report, timely made to a SANE nurse). In no case has this court endorsed the admission of reports of rape made subsequent to a timely, official report under the *Battle* rule. *Cf. Robles v. United States*, 50 A.3d 490, 492, 496-97 (D.C. 2012) (reports were excusably delayed and made to coworkers and family); *Williams v. United States*, 756 A.2d 380, 385-87 (D.C. 2000) (reports were made only to friend and pediatrician); *Galindo v. United States*, 630 A.2d 202, 209 (D.C. 1993) (report made only to mother); *Battle*, 630 A.2d at 214 (report made six weeks after the assault). Although the trial court in *In re L.C.* admitted two reports of rape alongside a contemporaneous report to a SANE nurse, the "sole issue on appeal [was] whether the 'report-of-rape' exception to the hearsay rule applies in bench trials." 41 A.3d at 1262-63.

behavioral changes "could reasonably support a conclusion that the evidence made it more probable that she did not consent to intercourse with the appellant").[19]  But *Battle* was not meant to admit an indiscriminate number of hearsay reports so as to risk that the factfinder would think that the repeated statements meant the rape did happen.  The *Battle* exception exists to serve a single purpose, which is to correct for the skewed societal belief that sexual assault complainants who did not make a contemporaneous report are lying.  630 A.2d at 216-17.

---

[19] The trial court also ruled that the prior consistent statements L.L. made to her husband, friends, and a detective could be admitted to place her distress and general state of mind in context.  But "[t]he state of mind exception . . . does not apply to a statement of memory or belief to prove the fact remembered or believed." *Grimes v. United States,* 252 A.3d 901, 918 (D.C. 2021) (internal quotation marks omitted).  Allowing the jury to hear five additional prior consistent statements through the backdoor of providing "context" for L.L.'s agitation "would result in the virtual destruction of the hearsay rule," *id.* (internal quotation marks omitted)—not to mention that any contextual value added would have been de minimis given L.L.'s trial testimony and her reports of rape in the 911 call and the SANE report.  The government's reliance on *Garibay v. United States*, 72 A.3d 133, 137-38 (D.C. 2013), to argue that reports of rape may come in as context for demeanor is misplaced.  As noted above, *Garibay* held that firsthand observations of a complainant's demeanor when the complainant is reporting a rape can come in because the observed demeanor "is independent evidence . . . just as a physical injury might constitute such evidence." *Id.* at 137-38.  Nowhere did we state that the demeanor observations needed context from the complainant's statements themselves and thereby justified those statements' admission.

Applying this general rule, we conclude that the five hearsay statements admitted under *Battle* in this case exceeded the boundaries of *Battle*. Although admitted on other grounds, L.L.'s 911 call reporting the rape directly after the alleged assault and L.L.'s narrative of the assault a few hours later documented in the SANE report amply compensated for the societal misconceptions addressed in *Battle*, rendering the five report-of rape statements officially admitted under *Battle* unnecessary.

### 3. Harmlessness

Although we conclude that the trial court erred in admitting five prior consistent statements by L.L. under *Battle*, our abuse of discretion analysis is not complete without discussion of harm. *Johnson*, 398 A.2d at 367. The same statements by L.L. that rendered the admission of other prior consistent statements unnecessary also rendered the admission of those statements harmless. After the jury heard L.L.'s statement to the 911 operator which was played for the jury and her statement to the nurse examiner several hours later which the nurse examiner read aloud on the stand, the statements that she made in the interim hours, see *supra* notes 12-16, could not have had discernable negative impact. In comparison, these statements were quite barebones, see *id*. And to carry its burden of proof that L.L.

had not had consensual sex with Mr. Torney, the government still would have been able to present evidence that L.L. was communicating with her husband, her parents, and her friends at 3:30 in the morning and that she sounded distraught.

We recognize that the government referenced these *Battle* statements in its rebuttal argument to respond to Mr. Torney's consent defense. *See Gabramadhin v. United States*, 137 A.3d 178, 186 (D.C. 2016) ("We have emphasized that a 'prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was . . . prejudicial.'" (quoting *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004))). Even so, stepping back and looking at the evidence as a whole, we do not discern a reasonable probability that the jury would have been "substantially swayed" by the admission of these statements.[20] *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The government's evidence that L.L. did not consent to sex with Mr. Torney was strong: (1) before the incident, she was out with friends who testified that there was no indication she was looking for a sexual encounter or was incapacitated by alcohol;

---

[20] We reach the same conclusion when we assess in the aggregate harm from both the admission of the *Battle* statements and the loss of the SANE photographs. *Sims v. United States*, 213 A.3d 1260, 1272 (D.C. 2019) ("The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the jury's verdict.").

(2) L.L. recalled they left the bar around closing time[21] whereas her friend Jess only testified that they parted ways "maybe" between 1:30-2:30, a vagueness that is reasonably attributable to the years that had passed by the time of trial; thus the defense argument that there was a missing hour or more before the 911 call at 3:37 am overstates the evidence; (3) L.L.'s ex-husband said she had been disinterested in anal sex during their marriage and the suggestion that the DNA analysis showed that she had had another anal sex partner was scientifically unsound; (4) as evidenced by the 911 recording and the SANE report which were admitted on other grounds not challenged on appeal, she told a largely consistent story about being held up at knife point and anally raped by Mr. Torney in her neighbor's yard—a story that was corroborated by the presence of Mr. Torney's DNA in her rectum, the dirt on her clothes as noted in the SANE report, and the disturbance of the ground in the area she said the rape had occurred, the same area where her husband recovered her wedding ring; and (5) the common sense assessment that an individual would not choose to have anal sex with a stranger outside on muddy ground on a cold, wet night if, as here, she could have done so just steps away, inside her house.

---

[21] We take judicial notice of D.C. Code § 25-723(b)(2) which, although it has been amended in other respects, has consistently required bars in the District to close at 3 a.m. on Sunday mornings. D.C. Code § 25-723(b)(2) (2010). *Gaither v. District of Columbia*, 333 A.2d 57, 59 (D.C. 1975) ("It is well recognized that a court takes judicial notice of laws and statutes of the jurisdiction in which the court sits.").

To be sure, Mr. Torney supplied the jury with alternate explanations for each of these pieces of evidence. But the core of his theory of defense—that L.L. had had consensual sex but shortly thereafter had accused him of rape out of fear of discovery—does not hold water as it appears the jury, after careful consideration, concluded. The evidence established that L.L.'s husband was away and no one had witnessed the incident. There was thus no discernable, precipitating event to set the "lie" in motion at 3:37 on the morning of the attack. In absence thereof, the powerful take away from the government's evidence is that she was telling the truth.

*　　　　　*　　　　　*

For the reasons discussed above, we affirm Mr. Torney's convictions and the judgment of the Superior Court.

*So ordered.*

FISHER, *Senior Judge*, concurring in part, dissenting in part, and concurring in the judgment: I agree that we must affirm appellant's convictions because any error by the trial court was harmless. I also agree with this court's holding that under current protocols a SANE nurse is part of the prosecution team for purposes of

applying Rule 16 when the victim has consented to the forensic examination. I do not agree that the trial court was required to strike the nurse's testimony about the photographs. That was a discretionary call to which we should defer. There was an extraordinary delay in bringing this case to trial, and we do not have a sufficient record to justify many of the criticisms contained in the section discussing the government's culpability.

Perhaps it was inevitable that this court would issue a decision attempting to limit the admission of *Battle* statements. Although we have cautioned against presenting too many statements or too many details from those statements, the government has shown little restraint. I fear, however, that the court's new "general rule" is too restrictive. For example, the admission of an official report to a SANE nurse or to the police should not prevent the trial court from admitting some of the victim's statements to provide context for the testimony of family members and friends about her appearance and demeanor when telling them about the attack. But see *ante*, note 19. I agree that the trial court misspoke when it referred to "state of mind," but its ruling nevertheless was sound. When defense counsel proposed that the demeanor witnesses be limited to saying, "I talked to her that night and she was distressed," the court responded, "I think that takes it so far out of context as to be meaningless. . . . [T]here has to be some context." This is the type of discretionary

decision that we should allow trial judges to make. Even if the statements providing context were admissible only under *Battle*, it was proper to admit at least some of them.